# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

UNITED STATES OF AMERICA

v.

PHILLIP TIMOTHY HOWARD

_____/

**SEALED
INDICTMENT**

4:22 cr43 - MW

**THE GRAND JURY CHARGES:**

## COUNT ONE

### Racketeering
### 18 U.S.C. § 1962(c)

### A. INTRODUCTION

At all times material to this Indictment:

<u>Financial Institutions</u>

1.      Bank of America, N.A. (hereinafter "BOA") was a financial institution that was headquartered in the state of North Carolina.

2.      Regions Bank (hereinafter "Regions") was a financial institution that was headquartered in the state of Alabama.

3.      Navy Federal Credit Union was a financial institution that was headquartered in the state of Virginia.

4.      MB Financial Bank, N.A. (hereinafter "MB Financial Bank") was a financial institution that was headquartered in the state of Illinois.


FILED USDC FLND TL
OCT 5 '22 PM 12:54

5.      Bank of New York Mellon was a financial institution that was headquartered in the state of New York.

6.      U.S. Bank, N.A. (hereinafter "U.S. Bank") was a financial institution that was headquartered in the state of Ohio.

7.      JPMorgan Chase Bank, National Association (hereinafter "Chase Bank") was a financial institution that was headquartered in the state of New York.

<u>Business Entities</u>

8.      Howard & Associates, Attorneys at Law, P.A. (a/k/a "Howard & Associates, P.A.") (hereinafter "Howard & Associates") was a Florida for-profit corporation and law firm established on or about February 22, 1995, and was headquartered in Tallahassee, Florida.  Howard & Associates had bank accounts at Regions.  Practice areas of Howard & Associates included class action and personal injury litigation.  Defendant **PHILLIP TIMOTHY HOWARD** was the founder and President of Howard & Associates, and its Senior Partner.

9.      Cambridge Capital Group, LLC (hereinafter "Cambridge Capital Group") was a Florida Limited Liability Company that was established on or about January 1, 2016. Defendant **PHILLIP TIMOTHY HOWARD** was the founder and President of Cambridge Capital Group.

10.      Cambridge Capital Wealth Advisors, LLC (hereinafter "Cambridge Capital Wealth Advisors") was a Florida Limited Liability Company that was

2

established on or about January 1, 2017.  Defendant **PHILLIP TIMOTHY HOWARD** was the founder of Cambridge Capital Wealth Advisors.

11.     Cambridge Capital Advisors, LLC (hereinafter "Cambridge Capital Advisors") was a Florida Limited Liability Company that was established on or about March 2, 2015.  Defendant **PHILLIP TIMOTHY HOWARD** was the founder and President of Cambridge Capital Advisors.  In or about May 2017, Cambridge Capital Advisors dissolved, and on or about June 28, 2017, Cambridge Capital Group Advisors, LLC (hereinafter "Cambridge Capital Group Advisors") was established as a Nevada Limited Liability Company. **HOWARD** assisted with operation of Cambridge Capital Group Advisors.

12.     Cambridge Capital Funding, Inc. (hereinafter "Cambridge Capital Funding") was a Florida for-profit corporation that was established on or about December 16, 2016.  Defendant **PHILLIP TIMOTHY HOWARD** was the founder and President of Cambridge Capital Funding.

13.     Cambridge Capital Group Equity Option Opportunities, L.P. (hereinafter "Cambridge Capital Group Equity Option Opportunities") was a Massachusetts limited partnership that was established on or about December 16, 2015. Defendant **PHILLIP TIMOTHY HOWARD** was the General Partner of Cambridge Capital Group Equity Option Opportunities.

14.     Cambridge Capital Partners, L.P. was a Massachusetts limited

3

partnership that was established on or about December 27, 2015.  Defendant

**PHILLIP TIMOTHY HOWARD** was the Executive Officer Director, and

President of Cambridge Capital Partners.

15.     Cambridge Capital Group, Cambridge Capital Wealth Advisors,

Cambridge Capital Advisors, Cambridge Capital Group Advisors, Cambridge

Capital Funding, Cambridge Capital Group Equity Option Opportunities,

Cambridge Capital Partners are hereinafter collectively referred to as "The

Cambridge Entities."  The Cambridge Entities had bank accounts at BOA.  The

Cambridge Entities were an investment company, as they solicited investors to

whom it offered and sold securities, in the form of interests in private funds.

D.W.R. was initially the investment manager of The Cambridge Entities' funds.

16.     Howard & Associates and The Cambridge Entities shared office space

and staff, and were interdependent on each other.  The investors of The Cambridge

Entities were clients of Howard & Associates, and many of the clients who

retained Howard & Associates did so based on promises of settlement advance

loans which were funded from investments of The Cambridge Entities.  Further,

some clients of Howard & Associates were solicited to become investors with The

Cambridge Entities as part of their consultations and meetings with Howard &

Associates.  The Cambridge Entities' investors relied on the success of litigation

commenced by Howard & Associates to realize returns on their investments.

4

17.    Preferred Capital Funding (hereinafter "Preferred Capital"), headquartered in Chicago, Illinois, was a national provider of settlement advance loans for plaintiffs involved in injury or workers' compensation lawsuits.

18.    Virage Capital Management, LP (hereinafter "Virage Capital"), headquartered in Houston, Texas, was a national provider of litigation funding for attorneys and law firms.

## B. THE ENTERPRISE

### Participants in the Enterprise

19.    Howard & Associates, The Cambridge Entities, the Defendant **PHILLIP TIMOTHY HOWARD**, and others known and unknown, together, constituted an enterprise as defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals and entities associated in fact, hereinafter referred to collectively as the "Enterprise." The Enterprise was engaged in, and its activities affected, interstate and foreign commerce. The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise.

20.    Defendant **PHILLIP TIMOTHY HOWARD** participated in the control and operation of the Enterprise. **HOWARD** participated in the control of the finances of the Enterprise, and also directed other members and associates of the Enterprise in carrying out the unlawful activities and other activities in

furtherance of the Enterprise's affairs.

21.     Defendant **PHILLIP TIMOTHY HOWARD** was a licensed Florida

attorney since on or about May 29, 1987, whose work included representing

former National Football League ("NFL") players who suffered concussion-related

brain injuries during their NFL careers in connection with a class action lawsuit

against the NFL (hereinafter "the NFL Concussion Lawsuit").

22.     The Cambridge Entities employed several employees and independent

contractors, including individuals referred to herein as "D.W.R.," "G.M.," "A.W.,"

"N.E.," and "J.K."

Purposes of the Enterprise

23.     The purposes of the Enterprise included the following:

a.      providing legal representation to plaintiffs in class action and

personal injury litigation,

b.      managing investment securities and funds,

c.      soliciting investors to whom interests in securities and

investment funds were sold,

d.      engaging in wire fraud to obtain investment proceeds from The

Cambridge Entities' investors, and to lull investors into a sense of security

and prevent action which might have interfered with the criminal activities

of the Enterprise,

     e.     engaging in wire fraud to obtain settlement advance and litigation expense loan proceeds from third-party lenders,

     f.     engaging in transactions to spend the proceeds of wire fraud,

     g.     concealing and perpetuating the wire fraud, and

     h.     increasing the revenue of the Enterprise, and, in turn, enriching the Defendant and associates of the Enterprise.

## C.  THE RACKETEERING CHARGE

24.    Between on or about December 1, 2015, and on or about January 18, 2018, in the Northern District of Florida and elsewhere, the defendant,

**PHILLIP TIMOTHY HOWARD,**

along with others known and unknown to the Grand Jury, being persons associated with and employed by the Enterprise, which Enterprise was engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly, willfully, and unlawfully conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise, through a pattern of racketeering activity, as set forth below.

### Racketeering Acts 1-6: Wire Fraud (former NFL player investors)

25.    Between on or about December 23, 2015, and on or about January 18, 2018, in the Northern District of Florida and elsewhere, the defendant,

**PHILLIP TIMOTHY HOWARD,**

did knowingly and willfully devise, and intend to devise, a scheme to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme, did cause a wire communication to be transmitted in interstate commerce.

<u>The Fraudulent Scheme</u>

It was part of the scheme to defraud that:

26.     Defendant **PHILLIP TIMOTHY HOWARD** represented former NFL players in the class-action NFL Concussion lawsuit who were eligible for settlement payouts from the NFL.

27.     Defendant **PHILLIP TIMOTHY HOWARD**, along with others, offered advance loans on potential settlement payouts to entice the former NFL players to agree to his legal representation.

28.     Defendant **PHILLIP TIMOTHY HOWARD**, along with others, fraudulently convinced the former NFL players and others to invest their NFL retirement funds with The Cambridge Entities, and then used the proceeds to provide high-interest, non-recourse loans to the same, or other, former NFL players clients.

29.     Defendant **PHILLIP TIMOTHY HOWARD** failed to disclose and misrepresented to the former NFL player investors the structure of the Enterprise,

and the conflicts of interest and the criminal background of persons associated with or employed by the Enterprise.

    a.    Specifically, **HOWARD** failed to disclose that D.W.R. was previously convicted of federal crimes involving fraud and false statements, and was barred from working for an investment firm.

    b.    **HOWARD** also failed to disclose to former NFL investors that Florida Bar rules forbade attorneys, including **HOWARD**, from managing assets maintained by clients of the law firm.

    c.    **HOWARD** also failed to disclose to former NFL player investors that after the Florida Bar advised **HOWARD** of the rules prohibiting his continued management of client assets, he dissolved The Cambridge Entities, which were registered in Florida, and re-registered them in the state of Nevada using the names of nominees for the corporate officers, without the nominees' knowledge or permission, in an attempt to hide his involvement with and control of The Cambridge Entities.

30.    Defendant **PHILLIP TIMOTHY HOWARD** failed to disclose and misrepresented to the former NFL player investors the true nature of The Cambridge Entities' funds and the actual investments.

    a.    Specifically, **HOWARD** provided former NFL player investors with prospectuses that falsely represented that the primary focus of the

Cambridge Capital Group Equity Option Opportunities L.P. investment fund would be "opportunities derived from the broad market indexes such as the S&P 500, Dow Jones Industrial Average, NASDAQ 100, and the Russell 1000," and "investment and trading in mortgage backed securities ('MBS') and derivatives, asset backed securities ('ABS') and derivatives, as well as US and International distressed private and public debt securities ('USI') and derivatives."

     b.    **HOWARD** provided former NFL player investors with prospectuses that falsely represented that the primary focus of the Cambridge Capital Partners L.P. investment fund would be to "generate capital gains and interest income primarily from investment and trading in mortgage backed securities ("MBS") and derivatives, asset back securities ("ABS") and derivatives, US and International private and public debt securities ("USI") and derivatives, and litigation settlement claims ("LS").

     c.    **HOWARD** failed to disclose that in reality, The Cambridge Entities invested almost exclusively in non-recourse, high-interest loans to former NFL players who were awaiting potential NFL concussion class-action settlement payouts.  Many of the former NFL player investors of The Cambridge Entities received advanced loans themselves, meaning that they were being loaned money (at high interest rates) from the same pool of

money in which they were already invested.  **HOWARD** failed to advise the former NFL player investors of these facts.

      d.     **HOWARD** failed to disclose to former NFL player investors that the NFL Concussion Settlement Agreement originally prohibited the assignment of claims, and later only permitted assignment of claims at 10% capped interest.

      e.     **HOWARD** failed to disclose to former NFL player investors that The Cambridge Entities' investment in "technology" was solely in a company called Omnipad, which was jointly owned by **HOWARD** and N.E. **HOWARD** failed to disclose to investors that he had direct access to the Omnipad bank account, which was used in part, as a slush fund for expenditures unrelated to the operation of Omnipad.  Further, **HOWARD** failed to disclose to investors that Omnipad ran out of money and closed in 2018, which included the layoff of its engineers, prior to the full development of a prototype of the technology it was supposed to be developing.

      f.     **HOWARD** failed to disclose to former NFL player investors that The Cambridge Entities' investments in "real estate" were non-revenue generating properties purchased in **HOWARD's** own name and were for **HOWARD's** personal use.

31.     Defendant **PHILLIP TIMOTHY HOWARD** failed to disclose

**HOWARD's** manipulation of the NFL medical claims process and the resulting

consequences.  For instance, **HOWARD** violated NFL Concussion Settlement

claims protocol and ethical standards by:

a.     Having **HOWARD's** clients' baseline psychometric

evaluations conducted in **HOWARD's** offices by a former legal client, Dr.

E.W., whose medical license was previously revoked.

b.     Allowing a Licensed Practical Nurse (LPN) that **HOWARD**

hired to conduct Clinical Dementia Rating (CDR) interviews of former NFL

player clients to also invest funds with The Cambridge Entities, which

permitted the LPN to have a financial stake in **HOWARD's** clients

receiving the highest possible impairment rating.

c.     **HOWARD** edited and drafted medical records for former NFL

player clients for the purpose of influencing whether the clients would

qualify for a monetary award from the NFL Concussion Settlement.

d.     **HOWARD** directed physicians to omit material facts from

documents that were submitted to the NFL Concussion Settlement.

32.     Defendant **PHILLIP TIMOTHY HOWARD** failed to disclose the

status and earnings of former NFL player investors' portfolios.  Specifically,

investors were not informed that quarterly investment statements produced by The

Cambridge Entities, reflected returns on investment that were calculated on a highly speculative projections, not on actual performance.  Despite reassuring investors that their investments were secure, **HOWARD** never informed investors that almost none of The Cambridge Entities investment funds yielded a return.

33.    Defendant **PHILLIP TIMOTHY HOWARD** failed to disclose that they commingled former NFL player investors' investment funds with those used to operate Howard & Associates and to issue payroll for its staff, pay **HOWARD's** mortgages, and otherwise personally enrich **HOWARD.**

34.    When NFL players inquired about the status of their investments, Defendant **PHILLIP TIMOTHY HOWARD** falsely assured them that their money was secure and could be returned or caused his employees and associates to falsely assure NFL players of such.  For example, when one NFL player grew suspicious about his investment with The Cambridge Entities which caused him to attempt to liquidate his account, **HOWARD** told him that "his money was secure but that due to an audit, he could not withdraw funds" (or words to that effect) and that **HOWARD** could not tell him how much was in his account" (or words to that effect).

35.    By all of the above-described conduct, Defendant **PHILLIP TIMOTHY HOWARD**, along with others, falsely and fraudulently obtained and attempted to obtain over $4 million to which they were not entitled.

Execution of the Scheme

36.     On or about the following dates, for the purpose of executing and attempting to execute the scheme to defraud, the defendant did knowingly cause wire communications to be transmitted in interstate commerce, as set forth below:

|  | **DATE** | **WIRE COMMUNICATION** |
|---|---|---|
| Racketeering Act 1 | December 23, 2015 | Deposit of check number 0000368332 and resulting transfer of $336,453.14 from The Bank of New York Mellon account number ending in 0261 to BOA account ending in 6604 |
| Racketeering Act 2 | April 8, 2016 | Transfer of $286,000 from MB Financial Bank to BOA account number ending in 6604 |
| Racketeering Act 3a | May 10, 2016 | Deposit and Transfer of $619,111.95 from Bank of New York Mellon account number ending in HH0A8 into MB Financial Bank |
| Racketeering Act 3b | May 19, 2016 | Transfer of $66,461.95 from MB Financial Bank to BOA account number ending in 8059 |
| Racketeering Act 3c | May 19, 2016 | Transfer of $552,600.00 from MB Financial Bank to BOA account number ending in 6617 |
| Racketeering Act 4a | June 15, 2016 | Transfer of $200,000 from U.S. Bank to MB Financial Bank. |
| Racketeering Act 4b | June 16, 2016 | Transfer of $170,000 from MB Financial Bank to BOA account number ending in 6617 |
| Racketeering Act 4c | June 16, 2016 | Transfer of $29,950 from MB Financial Bank to BOA account number ending in 8059 |
| Racketeering Act 5 | June 29, 2016 | Transfer of $320,000 from MB Financial Bank into BOA account number ending in 6617 |
| Racketeering Act 6a | January 31, 2017 | Transfer of $497,886 from MB Financial Bank to BOA account number ending in 6617 |
| Racketeering Act 6b | January 31, 2017 | Transfer of $165,000 from MB Financial Bank to BOA account number ending in 8059 |
| Racketeering Act 6c | October 15, 2017 | Email from **PHILLIP TIMOTHY HOWARD** to J.H. regarding J.H.'s investment funds |

In violation of Title 18, United States Code, Sections 1343 and 2.

## Racketeering Acts 7-10: Wire Fraud (settlement advances)

37.    Between on or about May 1, 2016, and on or about January 18, 2018, in the Northern District of Florida and elsewhere, the defendant,

**PHILLIP TIMOTHY HOWARD**,

did knowingly and willfully devise, and intend to devise, a scheme to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme, did cause a wire communication to be transmitted in interstate commerce.

### The Fraudulent Scheme

It was part of the scheme to defraud that:

38.    Defendant **PHILLIP TIMOTHY HOWARD**, along with others, sought a third-party lender, namely, Preferred Capital, that would be willing to lend money to **HOWARD's** former NFL clients in advance of their potential NFL concussion settlements as part of the NFL class-action lawsuit.

39.    Based heavily on the false and fraudulent information provided by Defendant **PHILLIP TIMOTHY HOWARD**, Preferred Capital approved and provided loans to over 25 of **HOWARD's** former NFL player clients.  Throughout the application process, Preferred Capital was unaware of the numerous material misrepresentations and omissions perpetrated by **HOWARD** and his staff.  Those misrepresentations and omissions included:

a.      **HOWARD** failed to disclose that player medical evaluations provided to Preferred Capital as the critical underwriting documents of the loan process, were the result of incorrect procedures, improper influence, and outright manipulation by **HOWARD** and his staff, ultimately making the reports ineligible for submission to the NFL Claims Administrator.

b.      **HOWARD** failed to disclose that the neuropsychologist used to produce significant portions of the player medical evaluations provided to Preferred Capital did not have the proper board certification required by the NFL Claims Administrator.

c.      **HOWARD** failed to disclose that the neurologist who signed off on final medical evaluations and impairment determinations had rescinded all of his reports from Howard & Associates in May 2017 due to ethical and financial concerns he had with Howard & Associates.

d.      All of the medical evaluations provided to Preferred Capital showed impairment levels of 1.5 or 2.0 (indicating the client qualified for an NFL settlement payout). However, **HOWARD** failed to notify Preferred Capital, especially after **HOWARD** received settlement advance proceeds, that those scores were invalid, and that players had to be re-tested due to the flaws and manipulations associated with **HOWARD's** original evaluation process. Furthermore, **HOWARD** failed to disclose that when players were

16

re-tested, significantly fewer were found to be impaired, including many of those to whom Preferred Capital provided loans.

      e.    **HOWARD** and his subordinates, and D.W.R., encouraged players to invest all or a portion of their Preferred Capital loan proceeds with The Cambridge Entities.  **HOWARD** failed to disclose to Preferred Capital that he was a principal of The Cambridge Entities, that he was soliciting players to invest their Preferred Capital loans with The Cambridge Entities, and that **HOWARD** controlled The Cambridge Entities' bank accounts, which were often the receiving institution for players' loans.

      f.    **HOWARD**, and D.W.R., failed to disclose that The Cambridge Entities was also issuing advance loans to players, and its investors' returns relied upon the same settlement payouts as Preferred Capital's loans.

40.    By all of the above-described conduct, Defendant **PHILLIP TIMOTHY HOWARD**, along with others, falsely and fraudulently obtained and attempted to obtain over $2,000,000 to which they were not entitled.

<u>Execution of the Scheme</u>

41.    On or about the following dates, for the purpose of executing and attempting to execute the scheme to defraud, the defendant did knowingly cause wire communications to be transmitted in interstate commerce, as set forth below:

17

|  | **DATE** | **WIRE COMMUNICATION** |
|---|---|---|
| Racketeering Act 7 | September 2, 2016 | Transfer of $160,000 by Preferred Capital to BOA account ending in 2500 with ID: [full name of C.F.] |
| Racketeering Act 8a | September 23, 2016 | Transfer of $50,000 by Preferred Capital to BOA Account ending in 2500 with ID: [first name of C.C. and first two letters of C.C.'s last name] |
| Racketeering Act 8b | February 16, 2017 | Transfer of $60,000 by Preferred Capital to BOA Account ending in 2500 with ID: [first name of C.C. and first two letters of C.C.'s last name] |
| Racketeering Act 9 | March 13, 2017 | Transfer of $32,000 by Preferred Capital to J.H.'s Navy Federal Credit Union account ending in 3835. |
| Racketeering Act 10 | July 20, 2017 | Transfer of $90,000 by Preferred Capital to Chase Bank account ending in 8128 |

In violation of Title 18, United States Code, Sections 1343 and 2.

## Racketeering Acts 11-13: Wire Fraud (litigation loans) and Associated Money Laundering Transactions

42.     Between on or about May 1, 2016, and on or about January 18, 2018, in the Northern District of Florida and elsewhere, the defendant,

### PHILLIP TIMOTHY HOWARD,

did knowingly and willfully devise, and intend to devise, a scheme to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme, did cause a wire communication to be transmitted in interstate commerce.

### The Fraudulent Scheme

It was part of the scheme to defraud that:

43. Defendant **PHILLIP TIMOTHY HOWARD** sought a third-party lender, namely, Virage Capital, that would be willing to lend money to **HOWARD** as litigation funding for the NFL class-action lawsuit.

44. Based upon the fraudulent material misrepresentations and omissions of Defendant **PHILLIP TIMOTHY HOWARD** and his staff, Virage Capital approved and provided litigation loans to **HOWARD** and Howard & Associates. Those misrepresentations and omissions include:

a. **HOWARD** failed to disclose that player medical evaluations, which were provided to Virage Capital as the critical underwriting documents of the loan process, were the result of incorrect procedures, improper influence, and/or outright manipulation by **HOWARD** and his staff, ultimately making the reports ineligible for submission to the NFL Claims Administrator.

b. **HOWARD** failed to disclose that the neuropsychologist used to produce significant portions of the player medical evaluations initially provided to Virage Capital did not have the proper board certification required by the NFL Claims Administrator.

c. **HOWARD** failed to disclose that the neurologist who signed off on final medical evaluations and impairment determinations had

rescinded all of his reports for Howard & Associates in May 2017 over

ethical and financial concerns he had with Howard & Associates.

    d.    **HOWARD** commingled funds obtained from Virage Capital

into accounts that were used for personal expenses and other costs that were

not authorized as part of the loan agreement and did not use said funds for

purposes of the NFL Concussion lawsuit, despite his false representations to

the contrary.

45.    By all of the above-described conduct, Defendant **PHILLIP**

**TIMOTHY HOWARD** falsely and fraudulently obtained and attempted to obtain

approximately $8,000,000 to which he was not entitled.

Execution of the Scheme

46.    On or about the following dates, for the purpose of executing and

attempting to execute the scheme to defraud, the defendant did knowingly cause

wire communications to be transmitted in interstate commerce, as set forth below:

|  | **DATE** | **WIRE COMMUNICATION** |
|---|---|---|
| Racketeering Act 11a | November 18, 2016 | Transfer of $3,878,808.34 by Virage Capital to Regions bank account ending in 7904 |
| Racketeering Act 12a | March 27, 2017 | Transfer of $4,246,000 by Virage Capital to Regions bank account ending in 7904 |
| Racketeering Act 13a | November 29, 2017 | Transfer of $654,500 by Virage Capital to Regions Bank account ending in 7904 |

In violation of Title 18, United States Code, Sections 1343 and 2.

47.    And further, the defendant,

## PHILLIP TIMOTHY HOWARD,

did knowingly engage and attempt to engage in a monetary transaction by,

through, and to a financial institution, affecting interstate commerce, in criminally

derived property of a value greater than $10,000, namely, the withdrawal, deposit,

and transfer of funds and monetary instruments, as identified below, such property

having been derived from a specified unlawful activity, that is, wire fraud, in

violation of Title 18, United States Code, Section 1343, as alleged in Racketeering

Acts 11a, 12a, and 13a, above:

|  | Date | Monetary Transaction |
|---|---|---|
| Racketeering Act 11b | November 21, 2016 | Transfer of $811,735.99 from Regions Bank account ending in 7904 to Ryan Marks & Stromberg Attorneys, LLP |
| Racketeering Act 11c | November 22, 2016 | Transfer of $693,111.39 from Regions Bank account ending in 7904 to Christopher N. Banthin, Esq. |
| Racketeering Act 12b | April 27, 2017 | Transfer of $100,000 from Regions Bank account ending in 7904 to The Omnipad Company, LLC account ending in 6564. |
| Racketeering Act 13b | December 1, 2017 | Conversion of $272,362.58 from Regions Bank account ending in 7904 into a Regions Bank cashier's check and associated transfer to Advantage Title Group |

In violation of Title 18, United States Code, Section 1957 and 2.

### Racketeering Acts 14 and 15: Wire Fraud (additional investor)

48.     Between on or about August 1, 2017, and on or about December 12,

2017, in the Northern District of Florida and elsewhere, the defendant,

**PHILLIP TIMOTHY HOWARD,**

did knowingly and willfully devise, and intend to devise, a scheme to defraud and

for obtaining money and property by means of materially false and fraudulent

pretenses, representations, and promises, and for the purpose of executing such

scheme, did cause a wire communication to be transmitted in interstate commerce.

<u>The Fraudulent Scheme</u>

It was part of the scheme to defraud that:

49.     Defendant **PHILLIP TIMOTHY HOWARD** and an employee of

The Cambridge Entities solicited J.I.E. to invest in a real estate project located in

Jacksonville, Florida.

50.     Defendant **PHILLIP TIMOTHY HOWARD** and an employee of

The Cambridge Entities fraudulently promised J.I.E. a 25% return on investment

within 60 days or a 50% return on investment within 120 days.

51.     Defendant **PHILLIP TIMOTHY HOWARD** and an employee of

The Cambridge Entities convinced J.I.E. to transfer money to a bank account of

The Cambridge Entities.

52.     Thereafter, Defendant **PHILLIP TIMOTHY HOWARD** and an

employee of The Cambridge Entities contacted J.I.E. and falsely told her that

additional money was needed from her in order to close that real estate deal, and

that she was guaranteed a 25% return on her investment within 31 days.

53. In reliance on this false promise, J.I.E. transferred additional proceeds to an account of The Cambridge Entities.

54. Several months later, J.I.E. spoke with Defendant **PHILLIP TIMOTHY HOWARD** about the real estate investment and the fact that she had not received her funds back. **HOWARD** falsely told J.I.E. that her investment was secure, and that her money would be returned to her.

55. By all of the above-described conduct, Defendant **PHILLIP TIMOTHY HOWARD** falsely and fraudulently obtained and attempted to obtain over $520,000 to which he was not entitled.

<u>Execution of the Scheme</u>

56. On or about the following dates, for the purpose of executing and attempting to execute the scheme to defraud, the defendant did knowingly cause wire communications to be transmitted in interstate commerce, as set forth below:

|  | **DATE** | **WIRE COMMUNICATION** |
|---|---|---|
| Racketeering Act 14 | August 24, 2017 | Transfer of $359,000 into BOA account ending in 2500 by J.I.E. |
| Racketeering Act 15 | August 31, 2017 | Transfer of $91,236.22 into BOA account ending in 2500 by J.I.E. |

In violation of Title 18, United States Code, Sections 1343 and 2.

All in violation of Title 18, United States Code, Section 1962(c).

## CRIMINAL FORFEITURE

57.     The allegations in paragraphs 1 through 56 of Count One of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture.  From his engagement in the violation alleged in Count One of this Indictment, the defendant,

### PHILLIP TIMOTHY HOWARD,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 1963(a), any of the defendant's interests acquired or maintained in violation of Title 18, United States Code, Section 1962; any of the defendant's interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which the defendant established, operated, controlled, conducted, or participated in the conduct of, in violation of Title 18, United States Code, Section 1962; and any of the defendant's property constituting, or derived from, any proceeds obtained, directly or indirectly, from racketeering activity in violation of Title 18, United States Code, Section 1962. The United States will also seek a forfeiture money judgment for a sum of money equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to this offense.  The property to be forfeited includes, but is not limited to, the defendant's interest in the following:

a.   Real property located and situated in Leon County, Florida, located at

9682 Deer Valley Drive, Tallahassee, Florida 32312:

Lot 4, Block "AG", Golden Eagle, Unit 6, Phase I, a subdivision as per map or plat thereof, recorded in plat book 13, page 20 of the public records of Leon County, Florida,

and further described in Leon County Official Records Book 3266 and Page 42 and

known to the Leon County Property Appraiser as Parcel Identification # 14-03-21-

AG-004-0.

b.  Real property located and situated in Duval County, Florida:

Condominium Unit 3005, THE PENINSULA AT ST. JOHNS CENTER, a condominium, together with an undivided interest in the common elements, according to the Declaration of Condominium thereof recorded in Official Records Book 14443, page 126, as amended from time to time, of the current public records of Duval County, Florida,

and further described in Duval County Official Records Book 18248 and Page

2153 and known to the Duval County Property Appraiser as Parcel Identification #

080393-0704.

63.   If any of the property described above as being subject to forfeiture,

as a result of acts or omissions of the defendant:

i.   cannot be located upon the exercise of due diligence;

ii.   has been transferred, sold to, or deposited with a third party;

iii.   has been placed beyond the jurisdiction of this Court;

iv.   has been substantially diminished in value; or

     v.     has been commingled with other property that cannot be

     subdivided without difficulty,

it is the intent of the United States, pursuant to Title 18, United States Code,

Section 1963(m), to seek forfeiture of any other property of said defendant up to

the value of the forfeitable property.

A TRUE BILL:

FOREPERSON ( Deputy )

_10/4/2022_
DATE

_____
JASON R. COODY
United States Attorney

_____
JUSTIN M. KEEN
Assistant United States Attorney